May it please the Court, I am Melinda Davison, and I'm here representing the industrial customers of Northwest Utilities. The other petitioners in this case have ceded their time to me with the exception of Canby Utility Board, and I will be splitting my time with Canby Utility Board. However, I am reserving five minutes for rebuttal. Petitioners respectfully request that you conclude as a matter of law that the Bonneville Power Administration did not follow its own rules, and that's referred to as the general rate schedule provisions, when it made its final decision to initiate a trigger of a rate-making process that imposed what is called the safety net crack. And the safety net crack was a provision that allowed Bonneville to essentially raise its rates without the same sort of safeguards that are in place for other rate provisions. There are no statutory limitations on the frequency with which Bonneville can change its rates. Bonneville agreed in establishing a five-year rate that it would limit its right to change its rate in certain defined circumstances, and they created what are known as the load-based crack, the financial-based crack, and the safety net crack, and the crack stands for cost recovery adjustment clauses. The load-based and financial-based cracks are defined in the general rate schedules, and they include very specific mathematical formulas that are utilized when imposing the cost recovery adjustments. The safety net crack is very different. As the name implies, this was only to be utilized in instances in which Bonneville had an extreme financial emergency. It was, in Bonneville's own words, its last line of defense to prevent BPA from missing a U.S. Treasury payment obligation. Once triggered, unlike the other two cost recovery mechanisms, BPA could unilaterally decide the amount of the adjustment and whether it should be in effect for the rest of the rate period, and keep in mind this was a five-year rate period. It was generally believed that Bonneville would never be able to meet the criteria for triggering the safety net crack. The requirements for the trigger of the safety net crack were the only protections that customers had. The safety net crack could only be triggered if BPA had already missed a Treasury payment or if it faced a greater than 50% probability of missing an upcoming Treasury payment. On February 7, 2003- And the crack doesn't specify how that could be determined, right? The 50%? Yeah. The crack does not contain detailed information about that. It was generally believed that since the crack said very simply that Bonneville was to conclude or conduct a calculation in which it determined that there was a greater than 50% probability of missing its Treasury payment, that by not having the specificity in the crack language, that that essentially meant that Bonneville was to consider all its cash on hand. It had a model that was in the underlying rate case, and that model, you simply plug in the numbers, push the buttons, and thus the model spews out a number at the end in terms of whether they had 50% or less probability of making its Treasury payment. Let me ask you a bit of historical information to clarify my own mind. When these cracks were adopted, was there ever a challenge to the way in which the SM crack was formulated? No, there was not. In the prior proceedings? No. The cracks came about as a result of a settlement of a rate case. So this formulation was something that was agreed to by the users? Yes, Your Honor. Customers? Yes, Your Honor. That's correct. And I gather, then, in that settlement proceeding and those discussions, there could have been, I guess, a model. You could have added other language to the language to trigger the meeting. That's correct, Your Honor. I think the way that we look at it, however, is just the opposite, that if you look at the load-based crack and the financial-based crack, that there is very specific language. And financial-based crack, in particular, has the language that says that Bonneville does not have to consider its refinancings from Energy Northwest. The safety net crack does not have that. And we believe, by implication, that means that Bonneville was simply to consider all cash on hand. There's nothing to allow it to exclude certain categories of cash. That's one reasonable approach, certainly, to say, well, they had to be driven to the wall. They had to reach into their wallets and throw away their lunch money and put it into the pot. They had to do all these other things and, you know, cancel paper, towels, whatever it was. That's one approach. But what's difficult is that's the only approach. They had to be driven to the wall and nothing else to be considered, and no other financial considerations were considered, no other reasonable business considerations, just they were flat broke.  It seems like that's what you're saying. That's how it must be read. That's how it can be read. That's how it must be read. I would say within certain parameters I would agree with that characterization because, again, if you look at it. That makes it really simple and sharp. It makes it a very simple issue. Do they have to be driven to the wall or not? Your Honor, I believe that's right because, as the name implies, it's the safety net. It is your last before you're falling into financial ruin. It's the last opportunity to raise rates. And so, absolutely, it was an emergency provision. But on the other hand, you know, it's a prediction which inherently involves making a series of assumptions, right? In other words, this crack requires the BPA to make a prediction, right? Whether it will or will not meet the 50% break point. And any prediction involves a series of assumptions. And the question is, you know, what governs how those assumptions are made? There's nothing in the crack to guide that, which to me means it's up to the discretion of the BPA as long as it's reasonable. Otherwise, it would have been in there to narrow the discretion. There's nothing in there to narrow the discretion of the BPA, is there, on making these assumptions? Well, Your Honor, I think that the way that we actually see this is a different perspective, and that is that it is not simply a prediction by Bonneville that in the rate case there was a model. And you simply plug in the amount of cash on hand and some other assumptions that are contained in that model, and that's already in the rate case. And so once you plug in that one variable, then the model runs and you get a number at the end. And by us taking the same assumptions, the same model, and simply including the $76 million of cash that Bonneville had on hand, it had in its possession at that time, you get a 53% probability of making the Treasury payment. Bonneville does not dispute that calculation. So it's not a matter of a wide variety of discretion or predictions. Those assumptions are already contained in the model. Well, of course, if they had come to me and said, you know, we're really falling on hard times, if you'll give us $86 million in cash, we'll have a checkbook. If you give us $86 million in cash, we'll put it in trust, and we'll hold it in a special trust fund to be used for only one purpose. And now comes crack time. And there they have it, cash on hand. Trustees, full legal title, they've got cash on hand. My trust money, my $86 million of trust money is in their pockets. And you would say, violate the trust? Well, of course, our facts... It's cash on hand. But I see our facts as being different than the example that you just... Well, come into my world. My world has that example. I know it's slightly different. Tell me, what would you say then? I would say that when the trust was established, it would matter how the parties intended that money to be treated. It would or would not? Pardon me? It would or would not? It would matter. And in this instance, because the safety net crack was simply a matter of an emergency, there was no set-asides. There was no, okay, this money for this reserve or this money for that. As you, Your Honor, correctly pointed out, it is truly the last resort, the last line of defense, and that's why Bonneville was required to consider all cash it had on hand. So here are my trust terms. If you'll do this for us, if you'll give us the 86 million, we will take that money and we will use it unless the world ends. We will use it to pay down our treasury debt. That's what they tell me. That's what we're going to use it for. That's why we want you to do X, Y, and Z. And so if you'll give us the money, we'll use it only for that purpose, generally, with another escape clause like your escape clause, okay? Now what? That's what they tell me. Okay, fine. I'll do this so you'll have 86 million bucks in your hands. Now comes crap time. What then? I think I'm closer to your world now. Your Honor, you are, but I would have the same answer. And that is that basically Bonneville has the obligations of its operating expenses and it has its obligation to meet its treasury payment. And meeting its treasury payment is one of its major obligations, and its rates are in existence to help it meet that obligation. And so that money, that 86 million in your example, should be counted toward meeting its obligations. And in this case, this was just simply a mathematical trigger as to whether they could then have this very broad discretion to raise rates. I understand. Let me just ask, had the BPA ever used Northwest debt extension to pay treasury payments? Prior to all of this? I am not aware of any prior circumstances. I'm sure if I am correct about that, my colleague will correct me. But I am not personally aware of that. Did they ever represent that they would use it? As far as I can tell on the record, there was no representation one way or the other. The assumption was that it would be all cash on hand, whatever the sources would be. Whatever the sources, all cash on hand. That's right. And where do you get that from? What's the source of that data? That is basically the understanding of the parties from the underlying rate case when the safety net cracks in the various financial base locations. You don't make that statement. You just make it from the language of the practice. No, Your Honor. I don't. So given the time that I have left, I better let my colleague raise his issues. Thank you. May it please the Court, my name is Paul Murphy. I'm here this morning on behalf of the Canby Utility Board. And Canby was not a party to the settlement that was referred to before. Canby has petitioned this Court to review and reverse an erroneous interpretation of its contract made by the Bonneville Power Administrator in the course of setting the rates that are here on review. We do not seek review of the rates themselves. This morning I'll try to address the following. The rate block language on which Canby relies in its argument is in fact in the administrative record before this Court. It's quoted in full at AR002374 and in the supplemental record submitted by Bonneville at SAR215. The Bonneville Power Administrator expressly considered this language and based his decision on an interpretation of the contract. He did not rule on any lack of evidence. And it's clear from the decision, which we have reprinted in its entirety at A7-9 of the addendum to our opening brief, that he in fact was interpreting the contract and had based his decision on this particular issue entirely on an interpretation of the contract. Now, Bonneville has argued at great length that there was serious evidentiary problems here. But the decision of the Administrator makes clear that those alleged problems bore no relationship to the decision that the Administrator made. And an agency's decision must be upheld, if at all, on the basis on which it was made and not on some post hoc rationalization brought forth by counsel before the Court. The interpretation of a contract is a matter of law, reviewable de novo by the reviewing court. The interpretation given to the Administrator to the key language in Canby's contract conflicts with the plain meaning of the contract itself, the words used by the parties to express their intent, and it destroyed a key purpose of Canby's contract. And this erroneous interpretation led Bonneville to breach its contract with Canby. The essential situation in this case is that the vast, vast majority of Bonneville's preference customers in the period of 2000, looking forward to the period of 2001 through 2011, signed 10-year contracts. By law, Section 5A of the Bonneville Project Act, Bonneville is required to have the contractual right to revise its rate not less frequently than five years. Therefore, for any contract that exceeded five years, it was required by law to have provisions in the contract which allowed it to amend its rates. It was not so required in a contract of five years. Now, in 2000, Bonneville offered its customers two options. They could take a five-year contract. They were setting five-year rates, and the intention was to have fixed rates for five years. Alternatively, a customer could take a 10-year contract. If it took the 10-year contract, they were guaranteed Bonneville's lowest priority firm rate for the second five years. They didn't know what it was going to be, but they were guaranteed the lowest priority firm rate. Those who took the five-year contract did not have that guarantee, so there was a tradeoff. Rate certainty, the most favorable rate treatment. Now, my client, almost alone among Bonneville's customers, chose rate certainty. It was willing to take a five-year contract only. In order to know the rates that it was being asked to pay for the duration of its purchase commitment, most of the customers chose the other alternative, and the language in the contracts were different as a result. There was a provision in the contract that was called the rate lie, and I will quote it. BPA may adjust the rates for contract power set forth in the applicable power rate schedules during the term of this agreement pursuant to the cost recovery adjustment clause in the 2002 GRSPs or successor GRSPs. Now, that's the standard rate lock language. Canby asked Bonneville to take the or successor GRSP language out of its contract, and Bonneville did so. And when the administrator later reviewed the arguments made by Canby as to their rights under the contract to be subjected to a set of GRSPs that were adopted after its contract was signed that did provide for revisions to the GRSPs, the administrator didn't say that there was no significance to the difference in the language. It's very clear from the administrator's decision that he recognized the language of Canby's contract was different than the standard. And he therefore said, what is the significance of the successor GRSPs? And he concluded that successors did not include the modifications that he was proposing to the GRSPs under the cracks. Well, the effect of that was to suggest — Just a minute now. Is that what you're saying? You say your position is that the 2002 GRSP is a successor? Is that what you said? My position is, Your Honor, that the clear meaning of the successor was not a defined term in the contract. And therefore, the Court should give that term its ordinary meaning. And we cited a case, Inland Boatman's Union of the Pacific. I'm just asking a factual question. Which GRSP are you contending is a successor GRSP that was applied to Canby? We are contending that the GRSPs that were developed in the process, this SN03 rate proceeding, was a successor to the GRSPs that existed before those amended GRSPs were adopted. Because they came after the contract. Well, because they were changed. They were a revision. And this Court has said that new, amended, revised, and successor. I'm quoting. You say the SN crack proceeding can't apply to you. That's it, right? We are contending that our contract precluded Bonneville from raising our rates based upon changes that it made to the GRSPs. That was the whole purpose for taking out the successor GRSPs. The Administrator acknowledged that that was the issue. What does successor mean? And there's no definition of successor. This Court has said that new, amended, revised, and successor all have the same meaning and the same legal consequence. But what happened is Bonneville had most of its contracts didn't have this limitation. And consequently, it adopted a set of GRSPs that provided for midterm revision, and it applied it to Canby. That's exactly it. See, that's exactly it. I think from Bonneville's point of view, successor GRSPs means the GRSPs that are adopted midterm. But because you only have a five-year contract, there is no midterm. But from the BPA's point of view, that phrase, as far as Canby's concerned, is surpluses, right? Because it doesn't apply to you at all. Now, what's wrong with that position? Well, when I say midterm, I was referring to mid the five-year term, the term of the raids. That's right. And the reason I disagree with that, the interpretation that Bonneville is offering, is because what it's trying to do is bootstrap what Bonneville did after it signed the contracts and said, well, after we signed the contracts, we then provided for revisions to the GRSPs, and therefore, they aren't successors. Well, that's not what successor means. Any normal reading of successor is that which comes after. They were amended, and they replaced them. There was three pages of SNCRAC GRSPs. They were replaced with 35 pages of entirely different language. If that's not a successor GRSP, I don't know what is. I believe I've taken all the time. Thank you. Thank you. I'll let you have a minute. May it please the Court. Good morning. My name is Kurt Cassad, representing Respondent Bonneville Power Administration. I have two issues before the Court today. I'll address the trigger issue first, if that pleases the Court. First, the trigger decision is not a decision that applies a rate. It doesn't change our rates. It's simply a decision of whether we can hold a hearing. So it's different than the much more onerous standards for actually changing rates. We've said, though, that it's subject to judicial review. Pardon me? We've said that it's subject to judicial review. Yes. Trigger decision. Absolutely. We don't have any problem with that. Yeah. So the issue in this case is whether the administrator's interpretation of his 2002 GRSPs is arbitrary and capricious. And the standard for the trigger determination starting the hearing is, quote, the SN CRAC will be available if the administrator determines that BPA forecasts a 50 percent or greater probability that it will nonetheless miss its next payment to Treasury. Under the GRSPs, the administrator makes the determination. The GRSPs identify no specific costs or funds that must be included, excluded, or treated in any way. Thus, the GRSPs, as one might imply from a decision that just starts a hearing, provide the administrator some discretion in determining TPP. Now, the administrator made a very reasoned decision documented thoroughly in the record. But in addition, I'd like to note that the law provides that an agency's interpretation of its own rules is entitled to deference, and even more deference than its interpretation of its governing statutes. Let me ask you this. Let's just go to this language. This language kind of looks like a basic prediction about the future. Is that correct? Right. We're to make a prediction about your ability to make these payments. That's correct. And I grant you it's pretty simple. Pretty simple language. It doesn't — it's not descriptive. But it doesn't — the DPA has — does DPA deny or dispute that it could use it? In fact, the representative would use it. We've acknowledged your — Forbearance on the debt, the mortgage debt. I apologize for interrupting you. We've acknowledged throughout our briefing that there are exceptional circumstances when those Energy Northwest refinancing proceeds might end up being used to make part of DPA's base treasury payment. However, all the proceeds from the energy refinancing are committed to paying an equivalent amount of higher interest federal treasury debt. And so, therefore, there are two sides to the debt. Does that have those proceeds have always been used? Yes. The debt optimization program was in effect for three fiscal years prior to this time. And under the program, it has to work that way. Otherwise, the program wouldn't exist. Otherwise, these proceeds wouldn't exist. Because Energy Northwest and BPA realized that BPA's financial well-being is critical to Energy Northwest and vice versa. There's no savings if we just push out debt. But there are benefits to BPA. If we can reduce our Energy Northwest debt, buy down additional higher interest treasury debt, and what that does, it not only saves us the interest money, but more critically for BPA. BPA has a cap from what it can borrow from the treasury. When BPA can make an early treasury payment, it increases that gap and allows BPA to finance things like transmission lines and other critical things that BPA must do. But you could, I guess, in a particular situation, decide you weren't going to make the payment, the early payment. Well, we could. If we had said something like that, first of all, I think the debt optimization program would be over because Energy Northwest would kill it. Second, the rating agencies for BPA-backed bonds said, if you do something like that, we're going to de-rate your bonds. And third, let's understand how this actually works. Because these funds aren't something BPA can just take and say, oh, when we're making the trigger determination in February, oh, we're going to have some money, and so we're going to just use it for whatever we want to use it for. The way this works is, at the end of the fiscal year, in September, BPA has to make its treasury payment. Now, under the law, BPA has to pay all of its other costs first, and it does so. Now, there are two portions of the treasury payment. There's the base treasury payment that we promised treasury we will pay. There's the additional treasury payment we promised Energy Northwest we would pay. Now, when we get to September and we make the treasury payments, we have the cash we have available to make those payments, and we apply it first to the base treasury payment. Now, if we have enough cash to pay them both, there's no problem. If, however, at that time, we only are able to pay, for example, the base treasury payment and not the additional payment we committed to Energy Northwest, then you could say that some of those Energy Northwest proceeds had been used de facto, out of necessity, to have paid some of our base payment. Now, if that occurred, it would not be good, because it would end up that we wouldn't have paid the treasury debt we committed to pay, and it would be pushed out. We'd have additional carrying charges, more debt, et cetera. So that's the way it actually works, Your Honor. Now, the administrator had a basic principle when he did the calculation, and that is the calculation should reflect the agency's normal, financially responsible conduct of its business at the time of the trigger determination. And as I mentioned, the debt optimization program — I believe that is in the record, Your Honor. I'd have to check to be completely sure, but I believe that is in the record. Yeah, I'm not positive. I'd have to check and be sure. Is that one that you just came up with right now on the spot, preparing for arguments? No, no, no. That language is in our brief. In your brief? It's in our brief. I don't believe it's in your brief. I read the record as much as possible. I didn't see that. I don't recall seeing it. It may not be there, Your Honor. I think what — but I'd have to check. I just don't know. I can't tell you for sure one way or the other. I'm sorry. Now, there are a number of problems with Petitioner's proposal. We believe it's wrong for a number of reasons. First, in really simple terms, Petitioner's proposal is the BPA should take its credit card and use it to make its car payment. Now, if I were an individual doing that, that would be financially irresponsible, and it applies similarly for an agency. It's just bad financial practice. Also, as I mentioned before, the use of the proceeds as they advocate would have jeopardized the debt optimization program. In our brief, we outline many different benefits that program has, both for BPA and its customers. Third, the debt optimization program — well, excuse me. A third problem with Petitioner's proposal would be that it would result in derating of our bonds by the rating agencies. For example, in the record we have statements from both Fitch and Standard & Poor's that said they would derate BPA-backed bonds if that kind of practice occurred. Now, in addition to the flaws with Petitioner's arguments, there are a number of arguments Petitioner's made to support their position. First, I'd like to address this $76 million of, quote, cash-on-hand argument. This was not raised below by anybody in the record or in the briefs. I read the initial and rebuttal briefs last weekend, and nobody made the argument. What Petitioner's have done is taken a number from a chart that's in the record and claimed that it was cash-on-hand. If they had raised it during the hearing, we would have pointed out, Your Honor, that actually it was money in an escrow account from an Energy Northwest bond issue in a previous year that was dedicated to covering $76 million of Energy Northwest principal coming due in 2003. But regardless, even if one assumed that there was $76 million of cash-on-hand or $300 million, that's not available for BPA to use as it sees fit. BPA has committed, through the debt optimization program, to use that to pay an equal amount of higher-interest Treasury debt with Energy Northwest. So— Let me ask you this. You know, this is just—as I read the brief and read the record here, everybody talked— the trigger is simply described as a procedural device in that you go to the notice stage and you go to the hearing stage. At the hearing, it may turn out that you don't need to save the cash-on-hand. Is that correct? That's absolutely correct. Right. So why isn't it proper, just to include everything on hand, you know, in a real-world situation, look at what you've got, when you make that determination to fool the triggers? And then, you know, if it doesn't—if it shows that cash-on-hand, including all this other money, which apparently is not mathematically documented in the record, but let's assume everything, and we just pull the—that's to be used to decide whether or not to pull the trigger or if you need to move into this notice and hearing stage. Why shouldn't you include everything? Because when you get to the hearing, you may decide, you know, you may decide the rate has to be higher. You may decide the rate has to be lower. It may not be any rate at all, maybe for a shorter period of time. Well, we did look at everything, but there are things that we felt were financially imprudent to use in certain ways. It's like you said. We're not going to—we're going to look at—we're going to look at these numbers, but we're—you know, we have this number. We're not going to look at that. We're just going to look at it. To the contrary, no. We looked at both sides. The doubt is actually— You'd never get to the hearing. If you did that, you'd never get to the hearing. You'd never pull the trigger. And therefore, you couldn't make the adjustment to hearing it, so it becomes circular, doesn't it? I'm sorry. I guess I don't understand the question. If you had to consider all of this money, then the trigger couldn't be pulled, right? If we had to consider all of the debt optimization— Like they are—like they are—like your opponents argue, then you never could pull the trigger, right? If we improperly decided to use committed proceeds to just keep our TPP calculation artificially high, yes. Correct. Then you'd never pull the trigger, and so when the drop-dead date came, you wouldn't have the money, correct? Well, if we incorrectly did that, that would be—I think it's a matter of fact. If we had—if we didn't have to use the money the way we committed it, and we could use it to artificially increase our TPP, then mathematically that would be the result. I guess—I guess ultimately, though, it may be that you've reached a point where taking everything into account, you aren't going to—it's not reasonably probable that you would make a point. And then you would trigger—then you would pull the trigger. And then, I guess, the result—one result of that might be that you would have higher rates, and you would have—you'd take longer to recover, and the cost would be higher. Is that right? Could you please repeat that again? I'm sorry. Well, look, if you took—if you didn't pull the trigger because you included everything— Okay. All right. And eventually, let's say the market—everything stays the same. Eventually, I gather what you're saying, is eventually, even taking the real world, everything we have on hand, eventually we're going to come—there's going to come a point where we're not going to be able to make that TPP payment. Absolutely. Right? Absolutely. And then you pull the trigger. You give notice. You go to the hearing. And I guess the end result of that would be possibly a higher rate. That's right. Maybe a rate that extends for a longer period of time, any number of different factors. That's correct. If we just push out our costs and our debt into the next year without meeting our obligations, then the next year it becomes much more likely— On the other hand, market forces may be better. It may make lots of money. One never knows. That's why the administrator has to make a call. And he did so based on the record in this case, Your Honor. Here we know—at least here we know that it's over time. As the hearing progressed, it turned out the revenues were better than what we originally anticipated, a 15% rate. Right. BPA was $1 billion in the hole when it did its TPP calculation. I mean, BPA was not financially in top shape. We were $1 billion in the hole. That's in the record. And it was no surprise. We had a 74% likelihood of missing our next Treasury payment as a result. And that was why there was a decision made to start the hearing because we needed to—you know, if we're $1 billion in the hole, we satisfy the TPP standard. Let's hold a hearing and see if we need one. And that's where all the evidence comes in from all the parties, all the financial analyses. And if we do, we do. If we don't, we don't. But that's what's done in that hearing to set that rate. Oh, my. You've got six minutes. Yes. It goes by fast. Okay, yes, very quickly. We're here having a good time. So let me—oh, there's one last thing on this before I turn to Canby, and that is the argument about the different language in the FB CRAC and the SN CRAC. We explained this thoroughly in our brief. Very quickly, the FB CRAC is based on accumulated net revenues. That's the defined federal accounting term. It reflects the savings of the Energy Northwest proceeds, but it doesn't reflect the pay down of the Treasury debt. Therefore, it shows you an artificially high net revenue amount that doesn't increase EPA's cash flows. So the administrator said for the FB CRAC, pretend that you just were using the original Energy Northwest financing proceeds. You had the money. You paid them off. Now, the SN CRAC, it shows both sides of the debt optimization program already. You don't need that language. Turning now to Canby, I apologize for my speech. First, I'd like to note that Canby argues that language that is not in Canby's contract should rule over language that is in Canby's contract, such that the SN CRAC does not apply to Canby. First — Let me, before you get into that, let me just ask you a little procedural. Do you agree that we have jurisdiction over Canby's language? I do, Your Honor. And I base that on this Court's decision. And Canby National Corporation v. Jura, it's 876 F. 2nd 745. And the Court said that — Ms. Canby, when he stood up there, he focused on the — he characterized it as a future contract. Right. I'm not complaining about the rate. But although they're intimately connected and the whole issue was raised in the rate procedure. Right. And the Court and CP National addressed that directly. And they said, look at what the real issue is. And here, the real issue is actually, what is the meaning of BPA's 2002 GRSP? Now, that's a rate-making determination. That has to be interpreted no matter whether there's a contract that has it or not. And so, what we are saying is that that means that when you have GRSPs — well, actually, let me take you through the way that the GRSPs were developed. First, in May of 2000, BPA had established some 2,000 rates and GRSPs. During the market crisis, BPA's costs went up. BPA told FERC, Canby, other parties, we have to revise our CRAC that's in GRSPs. And we said, we don't know how we're going to revise it. No, we're going to hold a hearing to revise it. Two weeks later, Canby signed their contract knowing that the GRSPs would be revised. And here's what Canby's contract says. They're not objecting to that revision that put the CRACs in. So, as I hear them, they're not saying, we're objecting to the fact that there were CRACs put in, that these three CRACs were put in the GRSP. So, it seems to me that's just — there it is. What my point is, Your Honor, is that we pointed out that the CRACs were going to be revised. Canby signed the contract under which it said, yes, we will pay the CRACs. And they knew they were going to be revised. Sure. So — and so the language says, BPA may adjust the rates for contracted power set forth in the optimal power rate schedule during the term of this agreement pursuant to the cost recovery adjustment clause in the 2002 GRSPs. There's no absolute rate lock. If you hear rate lock, there's no absolute rate lock because this provision says the rates are subject to the cost recovery adjustment clause in the 2002 GRSPs. Now, we pointed out that much of what Mr. Murphy said for his side of the case is not in the record. There was no testimony about what the intent was or what the parties thought or what the deal was. They chose not to present any evidence, any testimony, any exhibits, nothing for us to work with in the hearing. They raised it for the first time in their initial brief, and we just worked with what they had given us through two quotes in their brief. Through that, we concluded that they were wrong in their position. Now, when we adopted those GRSPs, we said we're going to develop the GRSPs, revise the crack GRSPs. We did so in two steps. First, we established the LB, FB, and SN cracks, but the SN crack provisions were very basic because in the record it says we can't really flesh out the SN crack GRSPs until we get down the road and see what the facts are at that time. When we know that, then we can fill those in. And so later on, we had the SN crack hearing to fill in and complete those 2002 GRSPs. Now, the 2002 GRSPs established the rates for five years. In 96 we did. In 2002 we did. In 2007 it's going to be three years. Here are 1996 rate schedules and GRSPs for five years. Here are 2002 rate schedules and GRSPs for five years. Here are the 2007 rate schedules and GRSPs for three years. They know, all of our customers know, that we establish our GSPs in one year. That's the title of those GRSPs, and they're valid for the term of the rates. Any modifications during the term become part of the GRSPs. And so the argument, basically what Canby's arguing is that they're entitled to pay a lower rate than all of our other customers with subscription contracts. They're entitled not to pay the cost BPA incurs to serve them, and they're entitled to shift those costs for other customers. BPA never agreed to that. And therefore, we believe the Court should affirm BPA on both of the issues raised in this case. Thank you very much for your time. Thank you. Thank you very much, Your Honor. Thank you. Two very important points I want to bring to the Court's attention. First and foremost, this case is about the trigger. This has nothing to do with how the administrator actually spends the money. That is not what this case is about. We have nothing in this record that suggests that it is our position that Bonneville administrators should have used the refinanced dollars to actually meet the Treasury payment. It is simply about the calculation for triggering the safety net crack. Secondly, my colleague informs me that from 1984 through the early 1990s, that Bonneville had a series of refinancings and that those dollars were actually used to reduce rates. It is reasonable for customers to have assumed that in calculating, doing the calculation for triggering the S& crack, that that language, which is admittedly very simple, was designed to be simple for the reason that it did not want to have a whole series of exceptions laid out. It was just a trigger and it includes all the cash the administrator has. At the point that it's triggered or not, the administrator can do whatever he sees fit for spending those dollars. The second point that I want to bring up that also has the same point with this, and I'll be very, very quick, is that if the customers, this was a settlement, and if the customers actually view this as being as open-ended as my colleague described it, that would have been a very unreasonable position for the customers to take, that they would agree to these cracks and just allow Bonneville to have full, unfettered discretion on how they implemented it. Thank you very much. Thank you. If that is the case, we appreciate your argument.
judges: Fernandez, Tashima, Paez